WHITTEMORE *v.* KENT SCIENTIFIC INSTITUTE.

CORPORATIONS—SERVICES OF OFFICERS—COMPENSATION—IMPLIED
    CONTRACTS.

   A member and officer of an incorporated society, which, to his
     knowledge, has never paid any of its officers for their services,
     and has no funds or means of raising any such for that pur-
     pose, cannot recover against the society for services rendered,
     on the theory of an implied contract to pay him therefor.
     So *held* where plaintiff, employed as curator of defendant's
     museum, which was maintained in connection with the city
     schools, sought to hold defendant for the value of his services
     after being dropped from the pay roll of the board of educa-
     tion.

Error to superior court of Grand Rapids; Newnham, J.
Submitted October 9, 1901.   Decided October 22, 1901.

*Assumpsit* by Charles A. Whittemore against the
Kent Scientific Institute for services rendered.   From a
judgment for defendant on verdict directed by the court,
plaintiff brings error.   Affirmed.

*Walker & Fitz Gerald (Myron H. Walker*, of coun-
sel), for appellant.

*Kingsley &. Wicks*, for appellee.

MONTGOMERY, C. J.   The facts of this case are very
clearly stated in the opinion of the trial court, rendered on
directing a verdict for defendant:

   " The defendant in this case has made a motion to take
the case away. from the jury, and direct a verdict for the
defendant, for the reason that the circumstances of the
case and the facts therein fail to indicate that the services
were rendered or received for compensation to be given by
the defendant, but clearly repel the idea that such pay-
ment was to be made or asked for.   The facts in this case

are as follows: The Kent Scientific Institute is an association which has been in existence since 1869. In 1885 the plaintiff became a member of the same, and was its secretary until 1889, at which time he was elected treasurer, and has remained treasurer from that time until the commencement of this suit. In 1896 he was re-elected secretary, and remained such until the commencement of this suit. In 1892, about the month of June, he was nominated by the defendant for the office of curator, and confirmed by the board of education of the city of Grand Rapids. The duties of curator were, substantially, to take care of the museum which belonged to the defendant, but which was practically used in connection with the high school of the city of Grand Rapids. In February, 1893, the board of education of the city of Grand Rapids placed the plaintiff upon its pay list at the rate of $900 a year. For the year 1893 and 1894 he was placed upon the pay list at a salary of $600 per year, which employment continued until the end of the school year 1897. From that time until the present the said plaintiff has been in office as curator, and continued as such until the present year, about May 10th. During the years 1897 and 1898 he submitted monthly bills to the board of education at the same rate that he had been getting from the board for his previous services,—$60 per month. These bills, as they were presented at the end of each month to the board of education, were not allowed by the said board of education. Plaintiff made efforts from time to time to have the board of education place him upon the pay list of its teachers, and pay him for the work which he performed as such curator. In 1898 he spoke to Col. Fox, president of the board of directors of the defendant association, in regard to getting some pay for his services, and, as stated by the plaintiff in his testimony, for the sake of giving him pay for his services he was employed, under a special agreement, to make a catalogue of the museum, being limited in the amount to the sum of $50. It is also in evidence in the case that, in the fall of 1897, the plaintiff met Dr. Holmes, the president of the defendant association, and informed him that he had given up his key to the janitor, and that Dr. Holmes told him that he ought not to have done that, and thereupon he went and got the key of the museum, and retained possession of the same. He wrote in 1899 to Professor Volland, stating that he would like to have some arrangements made for

his pay for back services and for future services, as there was no prospect of getting the same from the board of education. He also, it seems, wrote to other directors; and in December, 1899, the board took action upon the matter, declaring that they were not legally bound for any services which he had rendered.

"There is no question in the case but that the plaintiff did render services in connection with his duties as curator, but that can make no difference in this case, unless the facts and circumstances are such as imply a promise on the part of the defendant to pay for them. It will be noticed that the plaintiff, when he first became curator, in 1892, served until February, 1893, and that nothing whatever was said about pay, either by him or by any one connected with the institute, whereby he expected to charge, or did charge, the defendant for the same; that after the end of the school year 1893, when his salary was dropped by the board of education from the rate of $900 to $600 a year, without any question but that the services were worth just as much as they ever were, he made no effort to have the defendant make up any difference to him, or pay him anything in addition to what he was receiving from the board of education. During the vacations of the year, when he was on the paid list, the museum must and did need his attention, and yet he has made or makes no charge whatever for his services, nor has he done anything which would indicate in the slightest degree that he ever expected that any of the services that he performed upon the museum, or in connection therewith, were to be paid for other than by the salary which he received from the board of education.

"Now we come down to 1897, after he was dropped from the pay list. The plaintiff joined this institution in 1885. He knew its resources. He knew what its income was. He knew what the sources of income were. He knew that there were not more than from 25 to 50 members, paying the nominal sum of $2, and that the ordinary expenses of the institution took nearly all, if not quite all, of this amount for running expenses. He knew, all this time, that there was no money in the treasury, and no source from which any money could come, which could in any way be used to pay for the services of a curator. After 1897 he continued as before, but he rendered his bills to the board of education. As those bills were rejected, he made no complaint to the defendant of the same, or in any

way indicated that he considered that they were liable for his services. It is true that in February, 1898, a communication was addressed to the board of education, at the instance of the defendant, through their committee, Dr. Holmes and Col. Fox, whereby they sought to have the plaintiff placed again upon the pay list, and speaking very highly of his services, and that the requirements of the museum were such that it needed the services of a curator about all the time. But, while this may be so,—and the evidence does not contradict that point,—still it does not seem to me that there is any circumstance in that which would indicate that there was any implied promise, or any implied contract, either on the part of the plaintiff to receive any pay for those services from the defendant, or on the part of the defendant to pay for the same to the plaintiff.

"The matter runs along until the date of this special agreement made for cataloguing the museum. No effort had been made by the plaintiff, or anything done by him, up to that time, which would indicate to the board that he ever did charge them with the services he had rendered, or that he expected them to pay for the same; and, when this contract was made, it was made, according to the testimony of the plaintiff himself, to quote his language:

" 'I called upon Col. Fox, as president of the board of directors, and asked for some pay for my services; and, for the sake of giving me pay for my services, I was employed to make that catalogue.'

"This clearly indicates that, while the plaintiff thought he ought to be entitled to pay for his services, yet he did not consider that the defendant was holden for the same, and the making of this contract, in the manner and under the circumstances in which the plaintiff said it was made, negatives any idea of an implied contract for the services which the plaintiff claims that he rendered as curator.

"Again, there was some talk and some correspondence in reference to the museum being transferred to the State normal school at Ypsilanti; and the plaintiff, in that correspondence, holds the idea that he would be willing to work for so much, a part of which would go to reimburse him for the time and labor that he had already spent without remuneration, showing again conclusively that he was not holding this defendant liable for his pay for his services as curator.

"The only inference that can be drawn from the testi-

mony in this case is that this plaintiff has worked in and about the museum, familiarizing himself with all the various details of the same, until he may be said to be almost a part and parcel of it, and so considered himself; that, wherever the museum would go, he, as a part of the museum, would go with it. I do not mean to be understood by this that it is anything uncomplimentary to the plaintiff, but rather otherwise. It is true that, if there was any reasonable inference to be drawn from the facts in the case that there was an implied contract on the part of the defendant to pay for the services rendered, the case should be submitted to the jury upon that theory; but, taking the whole facts in the case together, there is nothing in my mind whereby any such inference can be drawn; and, while I have every sympathy with the plaintiff in the matter, and while it may be true that such services as he did render as curator should not have gone unrewarded, yet still I fail to see where there can be any liability upon the part of the defendant. As is said by Justice CHAMPLIN in the case of *Covel* v. *Turner*, 74 Mich. 408 (41 N. W. 1091), where the facts are undisputed, whether a contract is made out or not is for the court to determine; that where the testimony negatives the idea that the defendant expected to pay for the services, or that the plaintiff expected to charge the defendant for the same, there could be no agreement, either express or implied; and that the court was right in directing a verdict for the defendant.

"To sum up the entire case: Here is an association which pays no officer; has never, in its whole history, paid out its funds for the services of any officer. Here is the plaintiff, belonging to the association for 15 years, knowing all the facts and circumstances connected with it, its source of revenue, its expenses, and knowing that its financial condition expressly negatived the idea that a curator was to be paid, or any other officer. In view of these facts, and of those which I have detailed, all the facts and circumstances in the case seem to me to expressly negative the idea that there was an implied agreement on the part of the defendant to pay the plaintiff for his services, and therefore the motion must be granted."

We think, upon this statement of facts, that the trial judge committed no error in directing a verdict for defendant. It seems perfectly apparent, from the relations of the

parties, that the services were rendered without any expectation that the defendant would compensate the plaintiff. The case, in this respect, is very similar to *St. Jude's Church* v. *Van Denberg*, 31 Mich. 287. See, also, *Cicotte* v. *St. Anne's Church*, 60 Mich. 552 (27 N. W. 682), and *Hough* v. *Comstock*, 97 Mich. 11 (55 N. W. 1011), and cases cited.

The judgment will be affirmed, with costs.

HOOKER, MOORE, and LONG, JJ., concurred. GRANT, J., did not sit.